IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

THERESA RHONETTE JACKSON,

       Plaintiff,

vs.                                  CASE NO. 1:16-cv-176-WTH-GRJ

NANCY A. BERRYHILL,[1]
Acting Commissioner of
Social Security

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for disability insurance benefits ("SSDI") pursuant to Title II of

the Social Security Act ("the Act"). (ECF No. 1.) The Commissioner has

answered (ECF No. 9), and both parties have filed briefs outlining their

respective positions. (ECF Nos. 16 &17.) For the reasons discussed below,

it is recommended that the Commissioner's decision be affirmed.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Accordingly, pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill should be substituted for former Acting Commissioner of Social Security, Carolyn W. Colvin, as Defendant in this matter. The **Clerk** is directed to correct the docket accordingly.

# I.  PROCEDURAL HISTORY

Plaintiff protectively filed her application for SSDI on July 14, 2014,

alleging a disability onset date of May 1, 2014. (R. 18, 165–66.) Plaintiff

alleged several impairments, including human immunodeficiency virus

("HIV"), depression, anxiety, and attention deficit hyperactivity disorder

("ADHD"). (R. 189.) Her application was denied initially and upon

reconsideration. (R. 103–11.) Following a hearing on October 19, 2015, an

administrative law judge ("ALJ") issued a decision unfavorable to Plaintiff.

(R. 15–33.) The Appeals Council denied Plaintiff's request for review. (R.

1–4.)  On May 16, 2016, Plaintiff filed the instant appeal. (ECF No. 1.)

# II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by

substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is

more than a scintilla, i.e., the evidence must do more than merely create a

suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the

conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing

*Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982); *Richardson v.

Perales*, 402 U.S. 389, 401 (1971)); *accord Edwards v. Sullivan*, 937 F.2d

580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen,* 793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider evidence detracting from evidence on which the Commissioner relied). However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505 (2012).[2] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, he is not disabled. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is

---

[2] All further references to 20 C.F.R. will be to the 2012 version, unless otherwise specified.

disabled. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. § 404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[3] The Commissioner may satisfy this burden by pointing to the Medical-

------------------------

[3] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled. *Walker*, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

## III.  SUMMARY OF THE RECORD

### A.  Medical Evidence

Plaintiff's medical records begin in June 2008, when she was referred to Janet K. Humphreys, Ph.D, for a psychological evaluation in connection with a prior application for disability benefits. (R. 252–55.) After evaluation, Dr. Humphreys diagnosed Plaintiff with posttraumatic stress disorder ("PTSD"), bipolar disorder, and panic disorder. (*Id.*)

On March 12, 2013, Plaintiff reported to the Alachua County Health Department ("ACHD") for a new patient intake with complaints of left hand carpal tunnel pain, headaches, left lower extremity pain, anxiety, and depression. (R. 289–90.) Physical examination was largely normal. Plaintiff had a full range of motion and 5/5 muscle strength in all four extremities. (R. 293.) Her mood and affect were appropriate to situation. Michael Wallace, ARNP, referred Plaintiff to an optometrist for an eye exam in light of her frequent headaches. (*Id.*) Mr. Wallace also noted that Plaintiff had

previously been diagnosed with HIV. Her most recent CD4 count was 400.[4]

(R. 293–94.)

At her next ACHD follow-up in April 2013, Plaintiff reported aching

pains, diarrhea, vomiting, and a sore throat. Mr. Wallace diagnosed

Plaintiff with diarrhea, for which she was instructed to increase her dietary

fiber and take immodium, and acute bronchitis, for which she was

prescribed azithromycin and instructed to take Robitussin and Tylenol PM

and increase her fluids. (R. 287.)

In August 2013, Plaintiff returned to ACHD reporting that her left ear

hurt and that she had migraines. (R. 277.) She told Mr. Wallace that she

was getting headaches almost every other day, but that they resolved with

BC powder. (R. 279.) Mr. Wallace diagnosed Plaintiff with headaches and

instructed Plaintiff to continue taking BC powder and limit aspirin use. (*Id.*)

---

[4] "A CD4 count is a lab test that measures the number of DD4 T lymphocytes (CD4 cells) in a sample of your blood. In people with HIV, it is the most important laboratory indicator of how well your immune system is working and the strongest prediction of HIV progression. . . . . Once a person is infected with HIV, the virus begins to attack and destroy the CD4 cells of the person's immune system. . . . . The CD4 count of an uninfected adult/adolescent who is generally in good health ranges from 500 cells/mm3 to 1,600 cells/mm3. A very low CD4 count (less than 200 cells/mm3) is one of the ways to determine whether a person living with HIV has progressed to stage 3 infection (AIDS)." CD4 Count, https://www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/cd4-count/index.html (last revised July 14, 2016).

At her next follow-up with ACHD on November 19, 2013, Plaintiff's CD4 count was 214. (R. 275.) She had recently been hospitalized at Shands for pneumonia. (R. 274.) Mr. Wallace continued intravenous antibiotics for the pneumonia. (R. 276.) Mr. Wallace also completed a "Medical Report on Adult with Allegation of Human Immunodeficiency Virus (HIV) Infection." (R. 260–62.) He noted that Plaintiff had HIV wasting syndrome and diarrhea lasting for one month or longer, as well as pneumonia, which was resistant to treatment or required hospitalizations or intravenous treatment three or more times per year. (*Id.*)

Plaintiff returned to ACHD on March 12, 2014, for an HIV follow-up appointment and with complaints of abdominal pain. (R. 265–68.) Physical examination was normal. Plaintiff's mood and affect were appropriate to situation. Plaintiff's most recent CD4 and CD8 counts were 294 and 986, respectively.[5] (R. 267, 328.) Plaintiff denied any complaints or side effects related to her current antiretroviral therapy ("ART") therapy. Mr. Wallace assessed Plaintiff's HIV infection status as asymptomatic. An abdominal

---

[5] CD8 cells "are another type of white blood cell that seek out and destroy cells infected with viruses, including HIV-infected cells." CD4 Count, https://www.hiv.va.gov/patient/diagnosis/labs-CD4-count.asp (last visited Apr. 28, 2017).

ultrasound was negative. Thus, Mr. Wallace further assessed Plaintiff with

epigastric abdominal pain, for which he instructed Plaintiff to take

omeprazole. (R. 268.)

Plaintiff was supposed to return to ACHD on approximately May 2,

2014, to pick up her next round of medications. (R. 298.) She did not show

up, however, until seven days later on May 9, 2014. Staff noted that she

was "consistently late" picking up her medications and told Plaintiff she

needed to get better at picking up her medications on time. (*Id.*)

Plaintiff presented to Shands Emergency Center at Springhill

("Shands") on June 28, 2014, reporting fever and body aches for the past

four days, vomiting, decreased appetite, and lower abdominal pain. (R.

459.) Cardiovascular, pulmonary/chest, abdominal, musculoskeletal,

neurological, skin, and psychiatric examinations were normal. (R. 461.)

Chest x-rays revealed no acute cardiopulmonary process. (R. 468.) Plaintiff

was given fluids and zofran.[6] (R. 462.) Labs revealed trichomoniasis in

Plaintiff's urine. (R. 464.) She was assessed with hypokalemia, body

aches, and vomiting, and discharged later that day in stable condition. (*Id.*)

---

[6] Zofran is used to prevent nausea and vomiting. Zofran,
https://www.drugs.com/zofran.html (last reviewed Oct. 13, 2016.)

By August 2014, Plaintiff's CD4 and CD8 counts were 316 and 974,

respectively. (R. 403.) Plaintiff, however, presented to Shands on

September 9, 2014, with hemoptysis.[7] (R. 480.) She reported coughing up

blood several times a day for three days prior, chills, nasal congestion,

sore sinuses, sore throat, shortness of breath, and chest pain with

coughing. She was alert and oriented to person, place, and time.

Cardiovascular, musculoskeletal, and psychiatric examinations were

normal. She had no leg pain or swelling and her legs were non-tender. Her

lungs, however, had scattered rhonchi.[8] (R. 483.) An chest x-ray revealed

clear lungs, normal heart and mediastinum, clear pleural space, and

normal bones and soft tissues. (R. 493.) Plaintiff was discharged in stable

condition with bronchitis, hemoptysis, and rhinopharyngitis. (R. 485.)

Plaintiff returned to ACHD on September 11, 2014, after her

hospitalization for bronchitis. (R. 381.) She also reported having

headaches and swollen legs. (*Id.*) Her HIV infection was asymptomatic and

---

[7] Hemoptysis is the "[s]pitting of blood derived from the lungs or bronchial tubes as a result of pulmonary or bronchial hemorrhage." Stedmans Medical Dictionary 402150.

[8] Sounds made by air passing through bronchi on auscultation of the chest through bronchi that are narrowed by inflammation, muscle spasm, or the presence of mucus. Stedmans Medical Dictionary 783490.

Plaintiff denied any complaints or side effects related to her current ART treatment. (R. 383–84.) Mr. Wallace diagnosed Plaintiff with acute bronchitis and prescribed bactrim, instructed her to take Robitussin and Tylenol, and increase her fluid intake. (R. 384.) He also assessed Plaintiff with asymptomatic HIV infection status, depressive disorder, and benign essential hypertension. (R. 383–84.)

Plaintiff next presented to ACHD on January 21, 2015, for a follow-up. (R. 375–79.) Plaintiff reported having flu-like symptoms for the past three days. Physical examination was normal. Plaintiff was, however, 189 pounds at 5'3". Thus, Mr. Wallace assessed her to be obese. Mr. Wallace discussed proper diet with Plaintiff and encouraged her to exercise and lose weight. Plaintiff's CD4 and CD8 counts from December 2014 were 479 and 911, respectively. (R. 399.) Mr. Wallace changed Plaintiff's ART medication regimen due to resistance, noting that her flu-like symptoms could be related to low level viremia. Mr. Wallace nonetheless encouraged Plaintiff to be more compliant with her medications. (R. 375–79.)

Plaintiff voluntarily admitted herself to Lakeside Behavioral Healthcare ("Lakeside") on January 9, 2015, for having suicidal ideation.

(R. 366–69, 412–15.) Plaintiff reported being on Xanax, Prozac, Verapamil, and Percocet, but admitted she was not complaint with her medications for two days. Evaluation revealed that Plaintiff's psychomotor activity was decreased, her judgment poor, insight was restricted, and her impulse control inadequate. Physical and neurological examinations were normal. Plaintiff was diagnosed with depressive disorder and assessed a global assessment of functioning ("GAF") score of 30. (*Id.*)

After seven days at Lakeside, Plaintiff was successfully discharged on January 16, 2015. (R. 362–64, 408–10.) She no longer presented a risk of harm to herself. Her depression and anxiety had decreased, her sleep and appetite increased, she developed coping skills, and resumed compliance with medications. Upon discharge her GAF score was 55. (*Id.*)

By February 2015, Plaintiff's CD4 and CD8 counts were 384 and 1,145, respectively. (R. 452.) Plaintiff subsequently returned to ACHD for a follow-up on March 11, 2015, complaining of ear pain, constipation, and anxiety. (R. 433–38.) She denied fatigue, nausea, musculoskeletal problems, headache, or numbness or tingling. She also denied having any problems with her ART treatment. Other than weighing 205 pounds,

physical examination was largely normal. Mr. Wallace assessed Plaintiff with constipation, sinusitis, obesity, and noted that her HIV infection was asymptomatic. (*Id.*)

Plaintiff next presented to ACHD on June 24, 2015 for a follow-up. (R. 428–32.) Plaintiff denied fatigue, nausea, musculoskeletal problems, headaches, numbness or tingling, or depression. She denied having any problems with her ART treatment. Her weight had increased to 221 pounds. Physical examination, however, was normal. Her most recent CD4 and CD8 counts were 387 and 892, respectively. (R. 431, 454.) Mr. Wallace assessed Plaintiff with obesity and asymptomatic HIV infection status. (R. 428–32.)

Plaintiff was referred to Diana M. Benton, PsyD, for a psychological evaluation on September 5, 2015. (R. 350–54.) Plaintiff appeared to be a poor historian, providing information that differed from information she provided during her evaluation by Dr. Humphreys in 2008. She was, however, fully cooperative and interacted appropriately with office staff and Dr. Benton. Despite initially reporting euthymic mood, Plaintiff later stated, "I feel depressed every day but as long as I am doing something to keep

my mind occupied I'm ok." (R. 353.) Plaintiff told Dr. Benton that her physical and mental conditions did not interfere with work and that she was working 25–30 hours per week in the deli at Hitchcock's grocery store. Plaintiff reported she was capable of performing all necessary self-care. She could stand for ten to fifteen minutes, sit for about thirty minutes, and walk for thirty or forty minutes. At the time she was taking Vistaril and Prozac, which had been prescribed by Mr. Wallace. She had previously been going to Meridian for mental health treatment after being released from prison in 2010. She was supposed to go for the rest of her life but she could not afford it because she did not have insurance. Plaintiff told Dr. Benton, "I don't know why I can't get Social Security. I done went through so many surgeries and I have HIV and done went through so much and I done been through this so many times and them denying me. I need help with my anxiety medication and ADHD medication." (R. 353.)

Plaintiff demonstrated good eye contact and no pain behaviors. Her gait and posture were unremarkable. There was no evidence of involuntary movements. Plaintiff spoke spontaneously at a normal rate and tone and engaged appropriately in conversation. Dr. Benton found no evidence of

expressive or receptive difficulties with speech.

Plaintiff's thought processes were logical and goal oriented. There was no evidence of delusions or abnormal thought content. Similarly, despite Plaintiff's claims of occasionally hearing her name being called, there was no objective evidence of perceptual abnormalities. Plaintiff demonstrated proper orientation, intact abstract thinking, and intact remote memory. She provided reasonable responses when asked about hypothetical situations, her judgment was grossly normal, and her insight fair. She denied suicidal and homicidal ideation, intent, and plan. Dr. Benton diagnosed Plaintiff with PTSD, depressive disorder, and generalized anxiety disorder. (*Id.*)

## B. Opinion Evidence

### 1. *Dr. Humphreys*

Following her June 11, 2008 psychological evaluation, Dr. Humphreys opined Plaintiff's "immediate and recent memory appeared mildly impaired, which may affect her ability to carry out complex instructions. (R. 254.)

## 2.    Dr. Benton

Based on Dr. Benton's September 3, 2014 psychological evaluation, Dr. Benton opined that Plaintiff has "adequate capacity in the areas of understanding and memory, concentration, persistence, social interaction and adaptation to perform work for which she is suited." (R. 353–54.)

## 3.    Dr. Carter and Dr. Robertson

Deborah Carter, Ph.D., and Jermaine Robertson, Ph.D., both state agency psychologists, completed mental residual functional capacity assessments for Plaintiff on September 5, 2014, and March 29, 2015, respectively. (R. 80–81, 95–96.) Dr. Carter and Dr. Robertson opined Plaintiff does not have understanding and memory limitations or sustained concentration and persistence limitations because there is no evidence of impairment in these aspects. She also does not have adaptation limitations because there were no recent episodes of decompensation and Plaintiff appears to have adequate adaptive skills. Plaintiff does, however, have social interaction limitations pertaining to her moderately limited ability to interact appropriately with the general public. Nevertheless, she is not significantly limited in her ability to ask simple questions or request

assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id.*)

Accordingly, Dr. Carter concluded Plaintiff would be able to understand, retain, and carry out instructions, perform routine tasks on a sustained basis, cooperate with others in completing simple tasks, interact appropriately with others, and be able to perform at least simple repetitive tasks. (R. 80–81.)

Similarly, Dr. Robertson concluded Plaintiff would be able to understand, retain, and carry out simple instructions, consistently and usefully perform routine tasks on a sustained basis with normal supervision, cooperate effectively with the public and co-workers in completing simple tasks and transactions, and adjust to the mental demands of most new task settings. (R. 95–96.)

### 4.    *Dr. Meade*

On April 8, 2015, Larry Meade, D.O., a state agency physician, completed a physical residual functional capacity assessment for Plaintiff.

(R. 93–94.) Dr. Meade opined Plaintiff has exertional and postural

limitations due to her HIV fatigue, pain, and obesity. Specifically, Plaintiff

can occasionally lift and/or carry fifty pounds and frequently lift and/or carry

twenty-five pounds, but has no other limitations pertaining to pushing

and/or pulling. She can stand and/or walk for six hours in an eight-hour

workday and sit for six hours in an eight-hour workday. She can only

occasionally climb ladders/ropes/scaffolds, but can frequently climb

ramps/stairs, balance, stoop, kneel, crouch, and crawl. Plaintiff, however,

has no manipulative, visual, communicative, or environmental limitations.

(*Id.*)

## C.  Hearing Testimony

At the time of the hearing Plaintiff was forty-five years old and lived

with her grandmother. (R. 44–45.) Although she was 5'3" in height and

weighed approximately 225 pounds at the time, her weight goes up and

down due to the HIV. (R. 44.) Plaintiff was in regular classes throughout

school but only completed the eighth grade and never obtained a GED. (R.

45.) Plaintiff has a driver's license but does not drive because she gets

agitated and her anxiety kicks in. (R. 45, 47.) When necessary either her

friend drives her or she takes transportation for disabled people. (R. 46.)

Plaintiff has not worked since November 1, 2014, because she is always in pain from her HIV, she gets nauseous, and her anxiety and ADHD make it difficult to be around people. (R. 46–47.) The pain she experiences is in both of her legs and feels like needles. (R. 48.) Sometimes the pain gets so bad she cannot stand up. Plaintiff can stand for ten to fifteen minutes before she gets weak and has to sit down. If she takes three or four Tylenol she can stand up again after thirty minutes. (*Id.*) Plaintiff can walk for approximately twenty minutes and then has to stop. (R. 49.) Thus, Plaintiff rests the majority of the day due to her pain and she is most comfortable laying on her back. (*Id.*)

In addition, Plaintiff gets agitated and nervous when she sits in a chair and has to stand up after approximately thirty to forty minutes. (*Id.*) She also gets nauseous and has to take nausea pills three times a day. (R. 50.) The nausea pills help sometimes, but only if she doubles up on pills. (*Id.*) She gets fatigued and restless twice a day and does not want to be around anyone. (R. 51.) She has to sit down to feel better. (*Id.*) But, when Plaintiff takes her medications she can cope and is ok. (R. 50.)

Plaintiff gets migraine headaches once a day or every two days. (R. 51.) Sometimes her headaches last up to three days. She tries to relax and take Tylenol to make her headaches resolve. (*Id.*) Plaintiff also gets headaches every other day from the medications she takes, which are different from the migraine headaches. (R. 56.) She is limited with what medications she can take, however, because the health professional she sees at the health department cannot write prescriptions. (R. 51.) Nonetheless, Plaintiff takes medication for depression and anxiety, which she obtained from the health department. (R. 53.) Her doctor changes her medications often because her CD counts get low. (R. 53.) Plaintiff's current CD4 counts were somewhere around 201–202. (R. 54.) She also takes Trazodone to help her sleep and she is able to sleep for twelve to thirteen hours a night. (R. 56–57.) She admits although she has been told to quit smoking, she still smokes one or two cigarettes a day. (R. 63–64.)

Plaintiff was in Lakeside for two or three weeks because she wanted to hurt herself. (R. 52.) She still gets those feelings sometimes because her HIV makes her feel hopeless and just prays to get past them. (*Id.*) She also hears voices telling her to hurt herself approximately twice a week. (R.

53.)

Plaintiff can take care of her personal needs, shower, and get dressed. (R. 58.) To pass the time she watches television, reads, sits on the porch with her grandmother, goes to church on Sundays, and her friends come over to visit. (R. 57–58, 62.) She only occasionally remembers what she reads because she has a bad memory. (R. 62.) Plaintiff does not go to other peoples' houses because she gets freaked out being around a crowd of people and cries or gets nervous and depressed. (R. 58.) She helps her grandmother around the house on a regular basis doing things like cooking, cleaning, and laundry. (R. 59.) Plaintiff is able to help her grandmother for approximately an hour before she has to rest for two to three hours. (*Id.*) She is able to do the laundry using the washer, carry the clothes in a basket out to the yard, and then hang up the clothes to dry. (R. 62.)

Plaintiff is also able to go to the grocery store. (R. 59.) She can be in the store for as long as necessary as long as she rides on the scooter. If she walks, however, she has to sit down every twenty to twenty-five minutes. (*Id.*) When she grocery shops she can lift two or three of the plastic bags that weigh ten to fifteen pounds. (R. 60.) She can also carry a

gallon of milk in each hand even though she has carpal tunnel syndrome in her right hand and likely her left hand. (*Id.*) With respect to the carpal tunnel syndrome, sometimes her middle finger on her left hand locks up. (R. 61.) She has not had any treatment on her finger, however, because she does not have insurance. (*Id.*)

Plaintiff previously worked primarily in food prep. For example, she worked at Five Guys where she occasionally ran the cash register, but mainly wiped down tables. (R. 39.) She worked at Hardy's as a biscuit maker and also ran the cash register as needed. (R. 39–40, 42.) At Mama Rell's Plaintiff made sandwiches. (R. 40.) Similarly, at Home Town Supermarkets, Plaintiff worked in the deli department doing prep work for making food. (R. 43.) And at Pizza Hut, Plaintiff took orders over the phone and cashed those orders out. (R. 42.) In these jobs Plaintiff did not lift anything over 20 pounds. (R. 43.) She was on her feet most of the day, but was able to take breaks approximately three or four times per day for ten to fifteen minutes. (R. 43–44.)

## D.  The ALJ's Findings

The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2018. (R.

20.) He further determined that Plaintiff had not engaged in substantial

gainful activity since May 1, 2014. (*Id.*) The ALJ found that Plaintiff had the

following severe impairments: HIV, obesity, ADHD, depression, and

anxiety. (*Id.*) At step three of the sequential evaluation, the ALJ found that

Plaintiff did not have an impairment or combination of impairments that met

or medically equaled one of the listed impairments. (R. 21.)

   With respect to Plaintiff's residual functional capacity at step four of

the sequential evaluation, the ALJ determined that Plaintiff retained the

residual functional capacity ("RFC") to perform medium work as defined in

20 C.F.R. §§ 404.1567(c), with limitations. (R. 23.) Specifically, Plaintiff can

occasionally lift and/or carry and push and/or pull fifty (50) pounds, and

frequently lift and/or carry and push and/or pull twenty-five (25) pounds.

She can sit for four hours at a time and for a total of eight hours in an

eight-hour workday. Plaintiff can occasionally climb ladders, frequently

climb stairs and ramps, and frequently balance, stoop, kneel, crouch, and

crawl. Plaintiff has no limitations, however, regarding manipulation, vision,

or communication, and has no environmental limitations. Plaintiff is

precluded from performing complex tasks, but is fully capable of

completing simple, routine tasks consistent with unskilled work with

concentration on those tasks for two-hour periods with normal breaks and a lunch. Plaintiff cannot have more than occasional interaction with the public, but has no limitations regarding interaction with co-workers and supervisors. (*Id.*)

The ALJ determined Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible for the reasons discussed in the ALJ's decision. (R. 24.) The ALJ concluded at step four that Plaintiff was capable of performing past relevant work as a kitchen helper. (R. 27.)

The ALJ nonetheless proceeded to step five of the sequential evaluation and determined that although Plaintiff can return to past relevant work, considering Plaintiff's age, education, work experience, and RFC, there are also other jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. 28–29.) Accordingly, the ALJ concluded that Plaintiff has not been under a disability from May 1, 2014, through the date of the ALJ's decision. (R. 29.)

## IV.  DISCUSSION

Plaintiff raises two issue on appeal: (1) whether the ALJ erred by failing to make a credibility finding; and (2) whether the ALJ erred in his alternative step five finding. (ECF No. 16.) Defendant argues in response that substantial evidence supports the ALJ's credibility finding. (ECF No. 17.) Furthermore, Defendant argues that even though the ALJ was not required to proceed to step five, substantial evidence nonetheless supports the ALJ's alternative step-five determination. (*Id.*) Based on an independent review of the record, the Court agrees that substantial evidence supports the ALJ's findings.

At step four the ALJ must assess the claimant's RFC and her ability to return to past relevant work. § 404.1520(a)(4)(iv). The ALJ must take the claimant's medical evidence and other evidence into consideration in his RFC analysis. § 404.1520(e). If a claimant cannot return to her past relevant work, the ALJ moves onto step five to determine if the claimant can adjust to other work. *Id.*; *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004).

In determining Plaintiff's RFC at step four, the ALJ determined that although Plaintiff's "medically determinable impairments could reasonably

be expected to cause the alleged symptoms," Plaintiff's "statements

concerning the intensity, persistence and limiting effects of these

symptoms are not entirely credible for the reasons explained in this

decision." (R. 24.) Despite Plaintiff's assertion that the ALJ "failed to

explicitly make a credibility finding," (ECF No. 16 at 20–21), it is abundantly

clear that the ALJ did indeed make a credibility finding. Based on this

finding, the ALJ was required to consider Plaintiff's statements under the

Eleventh Circuit's three-part pain standard.

Under the Eleventh Circuit's pain standard, a claimant may establish

her disability through his own testimony of pain or other subjective

symptoms. *See Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005);

*Foote v. Chater*, 67 F.3d 1553, 1560–61 (11th Cir. 1995). The ALJ must

consider a claimant's testimony of pain and other subjective symptoms

where the claimant meets the Eleventh Circuit's three-part "pain standard."

*See Foote*, 67 F.3d at 1560. Under that test, evidence of an underlying

medical condition must exist. *Id.* If that threshold is met, then there must be

either objective medical evidence that confirms the severity of the alleged

pain or symptoms arising from the underlying medical condition, or

evidence that the objectively-determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain or symptoms. *Id.* A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is sufficient to support a finding of disability. *Id.* at 1561.

If the record shows that the claimant has a medically-determinable impairment that could reasonably be expected to produce her symptoms, the ALJ must evaluate the intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). In doing so, the ALJ considers all of the record, including the objective medical evidence, the claimant's history, and statements of the claimant and her doctors. *Id*. § 404.1529(c)(1)–(2). The ALJ may consider other factors, such as: (1) The claimant's daily activities; (2) The location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) Any precipitating and aggravating factors; (4) The type, dosage, effectiveness, and side effects of the claimant's medication; (5) Any treatment other than medication; (6) Any measures the claimant used to relieve her pain or symptoms; and (7) Other factors concerning the claimant's functional limitations and restrictions due to her pain or

symptoms. *Id.* § 404.1529(c)(3). The ALJ then will examine the claimant's statements regarding her symptoms in relation to all other evidence, and consider whether there are any inconsistencies or conflicts between those statements and the record. *Id.* § 404.1529(c)(4).

If the ALJ decides not to credit the claimant's testimony as to her subjective symptoms, the ALJ must articulate explicit and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *See Foote*, 67 F.3d at 1561–62. While the ALJ does not have to cite particular phrases or formulations, broad findings that a claimant was incredible and could work are, alone, insufficient for the Court to conclude that the ALJ considered the claimant's medical condition as a whole. *Id*. at 1562. The ALJ's articulated reasons must also be supported by substantial evidence. *Jones v. Dep't of Health & Human Servs*., 941 F.2d 1529, 1532 (11th Cir. 1991). The Court will not disturb a properly articulated credibility finding that is supported by substantial evidence. *Foote*, 67 F.3d at 1562. The failure to articulate reasons for discrediting a claimant's subjective testimony, however, requires that the testimony be accepted as true and becomes grounds for remand where credibility is critical to the outcome of the case*. Id.*

The ALJ is not required to recite the pain standard, but she must make findings that indicate the standard was applied. *Cooper v. Comm'r of Soc. Sec.*, 521 F. App'x 803, 807 (11th Cir. 2013). Whether objective medical impairments could reasonably give rise to the alleged pain is a question of fact for the Commissioner and the district court's review is limited to ensuring substantial evidence supports the Commissioner's finding. *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986).

In this case, the ALJ pointed to explicit and adequate reasons for discrediting Plaintiff's allegations pertaining to her symptoms. Substantial evidence supports the ALJ's reasons for discrediting Plaintiff's statements.

First, the ALJ pointed to objective medical evidence that supported her credibility finding. A lack of medical reports evidencing exertional limitations suggests that a claimant's impairments may not be as limiting as alleged. *See Sellers v. Barnhart*, 246 F. Supp. 2d 1201, 1211 (M.D. Ala. 2002) (finding that substantial evidence supported the ALJ's conclusion that plaintiff's impairments were not severe because there were no reports indicating exertional limitations); *see also Dyer v. Barnhart*, 395 F.3d 1206, 12111 (11th Cir. 2005) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the

ALJ's decision . . . is not a broad rejection which is 'not enough to enable

the district court or this Court to conclude that the ALJ considered her

medical condition as a whole.").

The ALJ noted as an initial matter, that the objective medical

evidence in general is very limited. (R. 24.) With respect to Plaintiff's

complaints of HIV-related fatigue and pain, Plaintiff's medical records do

not evidence these symptoms. Plaintiff's HIV infection status was stable

and asymptomatic at each follow-up from her onset date through her last

medical record. In March 2014, Plaintiff's CD4 count was 294 and she

denied any side effects related to her ART treatment. She likewise denied

any side effects related to her medications in September 2014. Although

Plaintiff presented to Shands once in June 2014, and once in September

2014, she was discharged both times in stable condition the same day. Her

medical records do not evidence any lingering symptoms following either of

these brief hospital admissions. And, despite having flu-like symptoms for

several days in December 2014 possibly related to low level viremia,

Plaintiff's CD4 count had increased to 479 and Mr. Wallace nonetheless

changed Plaintiff's medication regimen to counteract resistance. By

February 2015, her CD4 count was 384, she denied fatigue,

musculoskeletal problems, or numbness or tingling, and denied having any side effects from her HIV medications. And in June 2015, Plaintiff's CD4 count was 387, she denied fatigue, numbness or tingling, denied having medication side effects, and her physical examination was normal. In September 2015, Plaintiff reported that her physical conditions did not interfere with working at the deli and Dr. Benton noted a lack of pain behaviors. Despite Plaintiff's testimony that her CV4 count was very low around 201 within a month of her October 2015 hearing, there is no objective medical evidence corroborating this assertion.

Similarly, although Plaintiff claims her nausea also prevents her from working, her medical records do not evidence ongoing nausea. Although she presented to Shands in June 2014 with vomiting, she was discharged in stable condition after being given fluids and zofran. Afterwards, there is no further mention of nausea or vomiting in Plaintiff's medical records until January 21, 2015, when Plaintiff reported having flu-like symptoms for three days. Mr. Wallace, however, attributed the symptoms to resistance to the current ART treatment and, therefore, changed Plaintiff's ART medications. There is no evidence that Plaintiff continued experiencing nausea thereafter. Instead, in February 2015 and June 2015, Plaintiff

denied nausea or any medication-related complaints or side effects.

Likewise, while Plaintiff says she gets debilitating headaches, the only time Plaintiff reported having headaches after her onset date was at a follow-up appointment in September 2014. (R. 381.) At subsequent follow-up appointments Plaintiff denied having headaches.

With respect to Plaintiff's mental impairments, the ALJ also noted the lack of objective medical evidence supporting Plaintiff's allegations. In March 2014, Plaintiff's mood and affect were appropriate to situation. Psychiatric examinations at Shands in June 2014 and September 2014 were normal. Although Plaintiff was hospitalized in January 2015 for suicidal ideation, Plaintiff responded favorably to treatment, developed coping skills, and was discharged in stable condition. Since then, she has not required any additional hospitalizations. In June 2015, she denied being depressed. In September 2015, Plaintiff told Dr. Benton that her mental conditions did not interfere with her being able to work at the deli. Plaintiff also demonstrated logical and goal oriented thought processes, engaged appropriately in conversation, demonstrated intact remote memory, normal judgment, and fair insight, and provided reasonable responses about hypothetical situations. In sum, substantial objective

medical evidence supports the ALJ's credibility determination.

Secondly, the ALJ considered that Plaintiff has not required more specialized treatment for her alleged fatigue and pain. *See* 20 C.F.R. § 404.1529(c)(3) (the ALJ must consider "[t]he type, dosage, effectiveness, and side effects of any medication" the claimant takes or has taken to alleviate the claimant's pain and other symptoms, as well as "[t]reatment, other than medication" the claimant receives or has received for relief of her pain or other symptoms). Plaintiff never sought specialized care pertaining to pain management for ongoing pain or fatigue. *See Sheldon v. Astrue*, 268 F. App'x 871, 872 (11th Cir. 2008) ("conservative medical treatment for a particular impairment tends to negate a claim of disability"). Instead, as the ALJ noted, Plaintiff's ART treatment effectively controlled her HIV infection, rendering her largely stable and at all times asymptomatic. Similarly, despite her depression and anxiety, Plaintiff admitted to Dr. Benton and during her hearing that she is ok when she takes her medication. (R. 24, 50, 353.)  And despite her one hospitalization for suicidal ideation in January 2015, Plaintiff reported she had not taken her medications for two days prior. (R. 358.) She was thereafter discharged in stable conditions after resuming her medications and

learning coping skills and did not require any further hospitalizations pertaining to her mental conditions.

Third, the ALJ considered Plaintiff's activities of daily living in assessing Plaintiff's credibility. *See* 20 C.F.R. § 404.1529(c)(3) (in addition to the objective medical evidence and the claimants statements, the ALJ may consider other factors such as the claimant's daily activities). The ALJ noted that despite Plaintiff's claim that she gets too anxious and cannot be around people, she nonetheless is able to grocery shop, attend church, and has friends visit. Furthermore, although Plaintiff says her pain and fatigue physically limit her, Plaintiff is nonetheless capable of all aspects of self-care, including doing chores such as cooking, cleaning, and laundry, which requires her to carry the clothes outside and hang them up to dry. She admitted to Dr. Benton in September 2014, after her onset date, that neither her physical nor mental conditions interfered with work. Dr. Benton's examination also revealed no pain behaviors. The ALJ, therefore, properly found that Plaintiff's medical conditions and pain may not be as limiting as alleged.

Fourth, the ALJ pointed to opinion evidence that does not support Plaintiff's statements about the limitations imposed by her impairments.

*See* 20 C.F.R. §§ 404.1529(c)(1) (explaining that in evaluating the intensity and persistence of a claimant's symptoms, the Commissioner considers all of the available evidence, including the "medical opinions of your treating source and other medical opinions"). With respect to exertional limitations attributable to Plaintiff's HIV diagnosis, the ALJ gave Dr. Meade's opinion "great weight" because his opinion was consistent with the medical evidence of record and Plaintiff's limited treatment history. (R. 26.) Although Plaintiff testified that she can only stand for approximately 10–15 minutes, walk for approximately 20 minutes, and sit for approximately 40 minutes because of the pain in her legs, Dr. Meade opined Plaintiff can stand and/or walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday, and perform a reduced range of medium work based on her CV4 counts and asymptomatic HIV infection. As discussed, Plaintiff's medical records do not evidence pain in her legs after her onset date, ongoing fatigue, or any other conditions that would preclude her from performing a reduced range of medium work. Notably, none of Plaintiff's treating physicians ever noted any exertional limitations pertaining to Plaintiff's HIV infection.

Similarly, with respect to mental limitations, the ALJ gave Dr.

Benton's opinion "great weight" because her opinion was consistent with the medical evidence of record. (*Id.*) Dr. Benton opined Plaintiff has adequate capacity in understanding, memory, concentration, persistence, social interaction, and adaptation to perform work for which she is suited. (R. 353–54.) As discussed, other than Plaintiff's hospitalization in January 2015 for suicidal ideation, from which she was discharged in stable conditions after learning coping skills, Plaintiff's mental status examinations were largely normal, she demonstrated appropriate mood and affect, she admitted that her mental conditions did not interfere with her ability to work, and she demonstrated logical and goal oriented thought processes, engaged appropriately in conversation, and demonstrated intact remote memory and normal judgment.

The ALJ further gave the opinions of Dr. Carter and Dr. Robertson some weight because they suggested that Plaintiff has limitations concerning interaction with the public. (*Id.*) Nonetheless, the ALJ added additional limitations notwithstanding Dr. Carter and Dr. Robertson's opinions, precluding Plaintiff from performing complex tasks and limited her to simple, routine tasks and unskilled work in light of Plaintiff's one hospitalization in January 2015. Thus, substantial opinion evidence

supports the ALJ's credibility determination.

Although Plaintiff argues that she is disabled because she needs more breaks and longer breaks,[9] there is no evidence in the record that supports this assertion, other than her own testimony. To the extent Plaintiff relies on her mental impairment diagnoses, Plaintiff fails to suggest how these diagnoses prevent her from working eight hours a day for five days a week. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990) (the proper focus in determining a claimant's RFC, however, is the claimant's functional limitations, not the diagnosis). The ALJ has wide latitude in evaluating the weight of evidence, particularly the credibility of witnesses. *Owens v. Heckler*, 748 F.2d 1511, 1514 (11th Cir. 1984). Where, as here, substantial evidence supports the ALJ's credibility determinations, the Court cannot overturn the ALJ's findings.

Based on the ALJ's explicit credibility determination and RFC determination, the ALJ concluded at step four that Plaintiff could perform her past relevant work as a kitchen helper. (R. 27–28.) Plaintiff does not argue that the ALJ's RFC finding was erroneous—other than pertaining to

---

[9] Plaintiff does not point to any evidence in support of this argument.

his credibility determination—or that the ALJ erred in determining Plaintiff

could perform past relevant work as a kitchen helper. To the extent Plaintiff

makes vague references to error at step five of the sequential evaluation,

the Court need not address this argument because the ALJ was not

required to proceed to step five after concluding that Plaintiff could return

to past relevant work at step four. *See* § 404.1520(a)(4) ("If we can find

that you are disabled or not disabled at a step, we make our determination

or decision and we do not go on to the next step."); § 404.1520(a)(4)(iv) ("If

you can still do your past relevant work, we will find that you are not

disabled."). Substantial evidence supports the ALJ's conclusions.

Accordingly, the ALJ's decision should be affirmed.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the

decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on the 1st day of May, 2017.

*s/Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.** *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636**.